T.C. Summary Opinion 2010-176

UNITED STATES TAX COURT

RICHARD A. AND DELORES L. FRIMML, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5229-09S.                   Filed December 28, 2010.

Scott M. O'Shea, for petitioners.

Susan K. Bollman and Michael W. Bitner, for respondent.

KROUPA, Judge:  This case was heard pursuant to the
provisions of section 7463[1] of the Internal Revenue Code in
effect when the petition was filed.  Pursuant to section 7463(b),
the decision to be entered is not reviewable by any other court,

_____

[1]All section references are to the Internal Revenue Code
unless otherwise indicated.

and this opinion shall not be treated as precedent for any other case.

Respondent determined deficiencies in petitioners' Federal income taxes of $4,809 and $6,105 for 2005 and 2006 (the years at issue), respectively, and $961.80 and $1,191 accuracy-related penalties under section 6662(a) for those years.  We are asked to decide two issues in this case.  The first issue is whether petitioners conducted their American Paint Horse breeding activity (horse activity) for profit within the meaning of section 183 when they failed to generate a profit for 10 years (including the years at issue) despite allocating substantial funds and time to their horse activity.  We hold that petitioners did conduct their horse activity for profit.  The second issue is whether petitioners are subject to the accuracy-related penalty under section 6662(a).  We hold that they are not.

### Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference.  Petitioners resided in Luzerne, Iowa at the time they filed the petition.

Petitioners both grew up on farms and were married in 1985. They purchased their first two horses in 1988 and spent the next 10 years learning about horse breeding and developing a

business plan. Their business plan came to focus on American Paint Horses (Paints or Paint horses), a breed identified by their colorful coat patterns, strict bloodline requirements and distinctive stock-horse body types. Petitioners' knowledge at trial was extensive as it related to breeding and artificially inseminating Paint horses. Their knowledge included the genetics, the mechanics and the financial aspects of breeding.

Petitioners purchased a 6-acre property on which to develop their business in 1998, which they substantially repaired and improved on a cash available basis for the next seven or eight years. This property had more than doubled in value by the time of trial, in part because of petitioners' work. Petitioners initially maintained a very small stable of Paint breeding mares and sought to earn income by showing and selling the foals. They consulted experts on various aspects of the horse activity including showing, breeding and selling the Paints.

They leased an older Paint mare, Crymanitly, and found that she produced an excellent quality of foal. As a result, petitioners sought expert help and paid significant amounts to breed Crymanitly despite her older age. They also boarded her during her pregnancy to improve her chances of producing a healthy foal. Crymanitly produced a stallion named Zippos Special Reserve (Special) and petitioners adapted their business plan to include training, showing and breeding Special. They

also hired a professional to train and show Special to increase his value. They have identified semen production by Special as a potential future source of revenue.

Petitioners made many business decisions regarding the purchase, care and sale of a number of Paint horses for their horse activity. Petitioners paid extensive amounts to care for Special when he was injured. On the other hand, petitioners decided to put down a 2-year-old foal that hurt her leg in a fence accident because the cost to heal her exceeded the projected price in selling her.

Petitioners advertised their Paint horse activity primarily by showing their Paints. They considered showing their Paint horses to be the best advertising possible. They also advertised by boarding Special with a well-known professional horse trainer whose facilities "had a lot of traffic." They intended to set up a Web site as well, but had not done so as of the trial because Special was still in training.

Petitioners both had full-time jobs during the years at issue. Mr. Frimml repaired tracks and ties for Union Pacific Railroad and his railroad schedule allowed him generally equal days off after working seven days. He worked on the horse activity 6 to 10 hours per day during the time that he was home, caring for the horses, making improvements to the property and their facilities and transporting the Paint horses. While he was

away, Mrs. Frimml spent approximately 1-1/2 hours per day attending to the regular obligations of their horse activity. She was employed full time as an office worker at Dieomatic Incorporated. Petitioners have also spent substantial time attending Paint horse shows, learning about regional horses and horse facilities and otherwise advancing their activity. They rarely spent free time away from the Paint horse activity. In fact, one of them usually stayed back from family events so that the Paint horses were not unattended. Petitioners and their family and friends did not ride the horses.

Petitioners intended their Paint horse activity to provide retirement income. They did not believe their savings and assets were sufficient to cover their retirement needs. Petitioners had no sizable investments or substantial source of retirement income to augment their railroad retirement money and a small 401(k). Petitioners' gross wages and salaries totaled more than $90,000 for each year at issue. Their total expenses for the Paint horse activity during these years were $26,794 and $25,350. Petitioners organized their income and expenses by means of a check register.

Respondent issued the deficiency notice to petitioners, disallowing the Schedule F losses for the years at issue and determining the deficiencies and accuracy-related penalty for those years. Petitioners timely filed a petition.

## Discussion

We must decide whether Paint horse owners engaged in breeding horses for profit within the meaning of section 183 when they allocated substantial funds and time to their horse activity over a period of 10 years (including the years at issue) yet failed to generate a profit. We also must decide whether petitioners are liable for the accuracy-related penalty for the years at issue. We begin with an analysis of the horse activity under section 183.

Whether a taxpayer may deduct expenses related to an activity depends on whether it is carried on for profit. Secs. 162, 212. Subject to two exceptions in section 183(b) that do not apply here, a taxpayer may not deduct losses attributable to an activity unless that activity is engaged in for profit. Sec. 183(a). An activity is engaged in for profit if the taxpayer has an actual, honest profit objective, even if it is unreasonable or unrealistic. Sec. 1.183-2(a), Income Tax Regs.

We structure our analysis of whether an activity is engaged in for profit around nine nonexclusive factors. Sec. 1.183-2(b), Income Tax Regs. The nine factors are: (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his or her advisers, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that the assets used in the activity may appreciate in value, (5)

the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) whether elements of personal pleasure or recreation are involved. Id.

No factor or set of factors is controlling, nor is the existence of a majority of factors favoring or disfavoring a profit objective controlling. Keating v. Commissioner, 544 F.3d 900, 904 (8th Cir. 2008), affg. T.C. Memo. 2007-309; Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), affg. T.C. Memo. 1993-396; sec. 1.183-2(b), Income Tax Regs. The individual facts and circumstances of each case are the primary test, with greater weight to be given to objective facts than to the taxpayer's statement of intent. See Evans v. Commissioner, 908 F.2d 369, 373 (8th Cir. 1990), revg. T.C. Memo. 1988-468; Abramson v. Commissioner, 86 T.C. 360, 371 (1986). We now apply the factors to the facts here.

We begin with the first factor by considering whether petitioners carried on the Paint horse activity in a businesslike manner. See sec. 1.183-2(b)(1), Income Tax Regs. Factors that may indicate a profit objective include whether petitioners had a business plan, attempted changes in an effort to earn a profit, maintained complete and accurate books and records, and

advertised the horse activity.  See Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); Rinehart v. Commissioner, T.C. Memo. 2002-9; sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners spent a decade formulating a business plan for breeding Paint horses and adapted their business plan in efforts to earn a profit.  Their failure to reduce the business plan to writing is not fatal as its formulation and alteration over time are evident.  See Rinehart v. Commissioner, supra; Phillips v. Commissioner, T.C. Memo. 1997-128.  Petitioners purchased and substantially improved a 6-acre property on which to develop their business.  They adapted their initial plan of maintaining a very small stable of breeding mares once they learned the excellent quality of foal Crymanitly produced.  Petitioners again changed their business plan after Crymanitly's foal, Special, was born to incorporate training, showing and breeding Special.  They have identified semen sales by Special for artificial insemination as a potential source of future revenue.

The Court specifically notes petitioners' businesslike descriptions of decisions regarding their Paint horses. Petitioners paid extensive amounts to heal Special when he was hurt.  On the other hand, they put down a 2-year-old foal that hurt her leg in a fence accident because the cost to heal her exceeded the projected price in selling her.

Petitioners' check register, which they used to organize their income and expenses, was maintained in an unprofessional and imprecise manner. Petitioners' advertising was also not extensive. Petitioners advertised by showing their Paint horses and boarding Special with a well-known professional horse trainer whose facilities "had a lot of traffic." They intended to develop a Web site but had not done so by the time of trial because Special was still in training. Petitioners' business plan and businesslike approach to the horses suggest a profit objective, but their imprecise bookkeeping and limited advertising detract from this conclusion. This factor is neutral.

A second factor is the taxpayer's expertise, research and study of an activity, including consultation with experts. Sec. 1.183-2(b)(2), Income Tax Regs. Petitioners studied horse breeding in general and Paint horse breeding specifically for a decade before beginning their horse activity. The Court is convinced from their trial testimony that they have the requisite knowledge of breeding, including the genetics, mechanics and financial aspects of breeding. Petitioners also consulted experts on various aspects of the Paint horse breeding business including showing, breeding and selling the horses. They sought expert help to breed Crymanitly and boarded her during her pregnancy to improve her chances of delivering a healthy foal.

They hired a professional to train and show Special to increase his value.  This factor favors the requisite profit objective.

The third factor is whether the taxpayer devotes much personal time and effort to carrying on the activity, particularly if the activity does not have substantial personal or recreational aspects.  Sec. 1.183-2(b)(3), Income Tax Regs. Petitioners both had full-time jobs.  Mr. Frimml's job schedule, however, required that he travel for work for approximately a week and then have a week off.  He worked on the Paint horse activity 6 to 10 hours per day during the time that he was home, caring for the horses, making improvements to the property and their facilities and transporting the horses.  While he was away, Mrs. Frimml spent approximately 1-1/2 hours per day attending to the obligations of their horse activity.  Petitioners have also spent substantial amounts of time attending Paint horse shows, learning about regional Paint horses and horse facilities and otherwise advancing their activity.  They rarely spent free time away from the horse activity.  In fact, one of them usually stayed back from family events so that the Paints were not unattended.  This factor indicates a profit objective.

A fourth factor is the taxpayer's expectation that assets used in the activity may appreciate in value and generate an overall profit.  Sec. 1.183-2(b)(4), Income Tax Regs.  The property that petitioners acquired to start their horse activity

has more than doubled in value, in part because of improvements petitioners made.  Moreover, petitioners boarded Special with a well-known, professional trainer to increase his value.  We believe that petitioners expected that the value of assets used in their horse activity would increase.  We further believe that the expectation was sufficient to explain their willingness to sustain continued operating losses.  See Allen v. Commissioner, 72 T.C. 28, 36 (1979).  This factor indicates the requisite profit objective.

We now consider, as a fifth factor, whether petitioners have previously converted similar activities from unprofitable to profitable enterprises.  Sec. 1.183-2(b)(5), Income Tax Regs. Petitioners both grew up on farms.  We have no evidence, however, that they had ever undertaken similar activities in the past. This factor favors respondent.

We now consider the sixth and seventh factors, which center on petitioners' record of substantial losses and their absence of occasional profits.  Sec. 1.183-2(b)(6) and (7), Income Tax Regs. A series of losses during the startup phase of an activity may fail to indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.  This Court has recognized that the startup phase of an American saddle-bred breeding activity is 5 to 10 years and that a period of 5 to 10 years for the startup phase of an Arabian breeding operation is not

unreasonable.  Engdahl v. Commissioner, 72 T.C. at 669; Phillips v. Commissioner, T.C. Memo. 1997-128.  The years in issue, 2005 and 2006, are within this startup window.  We treat these factors as neutral because petitioners' losses and absence of profit during the years at issue were during the startup phase of their Paint horse activity.  See Strickland v. Commissioner, T.C. Memo. 2000-309.

An eighth factor is whether petitioners earned substantial income from sources other than the horse activity.  Sec. 1.183-2(b)(8), Income Tax Regs.  Petitioners both had full-time jobs and made over $90,000 a year.  We do not find, however, that they were using their salaries to support their horse activity as a hobby.  Petitioners established their Paint horse activity with the hope of satisfying their retirement needs.  They had no sizable investments or substantial source of retirement income other than their railroad retirement money and a small 401(k).  We think it unlikely that petitioners would embark on a hobby consuming so much of their income and entailing so much physical labor and time commitment without a profit motive.  See Engdahl v. Commissioner, supra at 670; Mary v. Commissioner, T.C. Memo. 1989-118.  This factor indicates a profit objective.

The final factor is whether petitioners received personal pleasure and recreational benefits from their Paint horse activity.  Sec. 1.183-2(b)(9), Income Tax Regs.  Petitioners have

made substantial improvements to their property and have spent significant time caring for their Paint horses and maintaining their facilities.  They did not ride their Paint horses, and they did not allow family and friends to ride them either.  This factor indicates a profit objective.

After considering all the facts and circumstances, we find that petitioners have shown that they engaged in their horse activity for profit.  Respondent did not contest the specific dollar amounts petitioners claimed as losses for the years at issue, and therefore petitioners can deduct all of the claimed losses.  Petitioners are also not liable for the accuracy-related penalty for the years at issue because of our holding regarding the deficiencies.

We have considered all arguments made in reaching our decision and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.